The State vs. George I. Henley,

*Indictment for stabbing another, not in his own defence.—Verdict, Guilty.*

A new trial will not be granted, to furnish an opportunity to impeach the credibility of a witness, who gave testimony on the trial.

After verdict, when the motion for a new trial is considered, the Court must judge not only of the competency, but of the *effect* of evidence.

After conviction, the prisoner moved for a new trial, producing the affidavit of prosecutor, that he had sworn falsely on the trial, and that prisoner never stabbed him. But it appearing to the Court, that the prosecutor had been drinking liquor, and that his mind was clouded thereby, at the time such affidavit was administered ; that the contents of such affidavit were not read to him by the Magistrate, and that he was sworn thereto, upon his saying that he knew the contents—that said affidavit was made by prosecutor, with the intention of immediately leaving the State ; that there was strong ground to believe that he was tampered with ; and the identity not being clearly proved, and his testimony given on the trial, having been confirmed by two disinterested witnesses—the motion was refused.

*Quære,* if a new trial can be granted *on the merits,* in a case beyond a misdemeanor ?

But such new trial will not be granted, when the presiding Judge is satisfied of the correctness of the verdict.

The prisoner on being put upon his trial, challenged a juror *peremptorily,* and he was set aside. The Jury, after hearing the evidence, not being able to agree, were discharged by consent. The prisoner was again put upon his trial at the same term, and one of the jurors whom he had challenged *peremptorily* at the former trial, being again presented to him, was challenged by him *for cause,* and the cause assigned was, that he had set him aside *peremptorily* on the former trial, and thereby created a prejudice on his mind, *Held,* that it was not a good challenge *for cause.*

By **ROBERT M. CHARLTON,** Judge.

THIS is a motion for a new trial, upon the following grounds :— 1st. Because since the trial of the prisoner, he has discovered new evidence, material and important to his defence. 2d. Because the prosecutor and witness, *John Lee,* who was sworn on the trial, has since the said trial, voluntarily made an affidavit, and delivered the same to the prisoner, in which he admits his innocence of the charge, and the falsity of the statements made

Part. ii.—M. 3.

on said trial, by the said witness, and which influenced the Jury in rendering a verdict of conviction. The 3d ground was waived on the argument. 4th. Because upon the second trial of the prisoner, the same Jurors who were challenged by him on the first trial, were again placed upon the panel, and having been compelled to challenge or accept said Jurors, he was thereby prejudiced in his right to challenge, by being compelled to exhaust his number of peremptory challenges from the original panel.

The first and second grounds may be examined together. The newly discovered evidence consists of the affidavits of *John Mulligan* and *Wm. McDermott*, both of whom swear, that they were imprisoned in the room with *John Lee*, the prosecutor on the above indictment, and that they frequently heard him declare, that he believed the prisoner to be innocent, and on the day on which prisoner was tried, and before *Lee* left the Jail, to give his testimony, he repeated his belief of the innocence of prisoner, and prayed to God that he might get clear. I may dismiss these affidavits with the remark, that a new trial will not be granted to furnish an opportunity to impeach the credibility of a witness who gave testimony on the trial. After these alleged declarations, he gave testimony to the contrary, and it would be introducing a dangerous principle, to allow the verdict to be set aside on affidavits like these. But the affidavit of *Lee* himself, made since the trial, and now offered in support of this motion, requires a more attentive consideration. That affidavit declares, that since his discharge from Jail, he has thought on all the circumstances, and that being about to leave Savannah for the West Indies, he wishes to do justice to the prisoner, and to declare the truth. He says that he (*Lee*,) did draw a knife on *George Millen*, before *Millen* knocked him down; that he fell with the knife in his hand, and knows that he was wounded in the fall; that prisoner did not touch him till after he felt the wound; that the knife he used to peel potatoes with, was

a knife belonging to the pilot boat, and was not a pointed knife : that on the day of the trial of prisoner, as he (*Lee*) arrived at the Court House, he was persuaded by *John Low*, and others, to charge prisoner with having stabbed him ; that he was threatened with being prosecuted and punished, if he did not swear in that way, by the said *John Low*, and was compelled to come back to Savannah for that purpose ; but that now being out of Jail, and no longer in the power of *John Low*, he makes this statement to show why he swore on the trial as he did, and that before he did so swear, he prayed at the Jail, that prisoner might get clear, because he knew that prisoner did not stab him.    This affidavit is sworn to, on the 23d February, 1837, before *Wm. A. Pittman*, J. P. and witnessed by *Thos. F. Moxham* and *Henry Hay*.    These affidavits are met by the Solicitor General, by the deposition of *Wm. A. Pittman*, the said Magistrate, that he was at *Dibble's* shop, on his horse, in the latter part of February last, and that he was called by *Robbins*, to swear one *John Lee*, and another person, whose name he does not now recollect, and that he did swear them to an affidavit, the purport of which he does not know, as he was told by them that they had heard the contents read ; that he thinks *Lee* had been drinking, but that he did not seem to be very drunk, and that this was the only affidavit which he took from said *Lee*.  The Solicitor General also produces the affidavit of *John B. Mills*, who states, that he was Steward of the Hospital in August last, when one *John Lee*, a seaman, was brought to Jail, wounded by a stab in the back ; that he was in a critical situation, and in his sane moments, when no one was near him who could influence him, of his own free will he stated to witness, that one of the two men who came together on board the pilot boat of *John Low*, in July, had stabbed him ; that he did not know his name, but that it was the short man.    The affidavit of the attending physician, Dr. *Richard D. Arnold*, was also produced, who testifies, that he examined the back of *Lee*, whilst in the Hospital, and found a cicatrix about 5-8 or 3-4 of an inch broad, (evidently resulting from a

penetrating instrument,) in the left side of the spinal ridge, in the lumbar region : that his situation was very critical, and that deponent thinks that it was occasioned by said wound, and that from the situation of it, he does not believe that he could have received it by falling on any instrument, unless that instrument was of considerable length, such as an ordinary sword cane, of twenty inches, or upwards; and that from the cicatrix, he judges the stab to have been a deep one.   The prisoner's counsel then introduces the affidavit of *Thomas F. Moxham*, who swears, that he was present when Justice *Pittman* administered an oath to *John Lee*, on the 23d February, 1837, and that he knows that said *Lee* was well aware of the contents of the affidavit, as deponent inquired of him if he was, and he replied "yes:" that the said *Lee* had been drinking, but was not so affected by drink as not to understand the affidavit, or to be incapable of swearing to, and subscribing it.   The affidavit of *John Low* has since been handed to me, in which he denies that he has ever used any threats towards *Lee*, or offered any bribe to him, or in any way attempted to influence him to prosecute either prisoner or *Millen*, or any other individual, or to give testimony against them.   The affidavit of *Hugh Cullen* is also introduced, (a part of which being founded on hearsay testimony, is therefore inadmissible,) in which, among other things, he testifies, that *Spencer*, the clerk of prisoner's step-father, was three times at deponent's house, after the trial, to see *Lee*, during the two days that *Lee* remained with deponent, after the trial, and that *Lee* was very drunk on the first of those days, and that his habits were intemperate.

Upon these affidavits the motion is presented to me, and it will be my duty now to enquire, whether the legitimate effect of such evidence would be to require a different verdict, for I agree with the Court, in *Ludlow's heirs* vs. *Park*, (4 Ham. Ohio Rep. 5,) that after verdict, when the motion for a new trial is considered, the Court must judge, not only of the competency, but of the effect of

evidence. To do this properly, I must advert briefly to the testi-mony given in the cause. I must see which of these two contra-dictory statements, on the part of *Lee*, is to be believed. I must contrast them with the facts, as testified to by other witnesses, and then determine whether, after this examination, such a case is pre-sented to me, as will authorise me in putting aside this verdict. The prisoner has been twice tried. On the first trial, the Jury could not agree, and were discharged by consent. The situation of the prosecutor, who had been confined in Jail for five or six months, in consequence of not being able to give security to prosecute, and who was suffering from the effects of his wound and confinement, seemed to me to require, that he should not be detained in Jail until the next term ; and as I saw nothing in law or justice against it, and a great deal of humanity in it, I acceded to the motion of the So-licitor General, and ordered that the prisoner should be tried again at the same term.

On that second trial, *Lee*, the prosecutor, testified, that he was cooking in the galley of the pilot boat Sarah M., when *George Millen* came down and commenced searching for a seaman ; that witness told him that the man was at the mast head, and remon-strated with him against throwing the things about, when *Millen* picked up a piece of wood and knocked witness over the head : that he fell against a cask, and that whilst lying in a " slanting" position, against such cask, prisoner, who had followed *Millen* down, took a knife which was on the top of the copper, and stab-bed witness in the back. *Lee* swears distinctly, that he had no knife in his hand when *Millen* and prisoner came down, or whilst they were below : that before they came down, he had been peel-ing potatoes with a sharp pointed knife, but that he had placed it on the lids of the coppers, from which place prisoner took it, and stabbed him. He admits that he was rendered quite " stupified," though not insensible, by the blow which *Millen* gave him, and says, in his cross examination, that it was hard to say who struck

him, but that *Millen* and prisoner were the only persons down in the cook's galley, and that *Millen* did not stab him; but he swears that he had no knife in his hand before he fell, and that he was quite sure he did not stab himself, and that there was also a slight scratch on his right arm.    It was quite evident to the Court, that the witness had not a very clear idea of what passed, after he was struck down by *Millen*, but he was corroborated in the facts of his being so struck down, that when he fell he had no knife of any description in his hand, and that prisoner was the individual who stabbed him, by the testimony of *Joseph Knight* and *Hugh S. Watts*, who do not seem to have any interest in the matter, and who describe the position of the knife before prisoner took it, and the manner of his stabbing *Lee*, with a minuteness and distinctness, that leave no room to doubt, that they either saw what they have sworn to, or else that they have perjured themselves.    The position in which they were, looking down upon, and immediately over the parties in the hold, with no impediment to their vision, gave them full opportunity of seeing all that was going on.    They also swear, that when *Lee* received the stab in the back from prisoner, he groaned, and prisoner made another stab at him, and *Lee* threw up his right arm, and received the second stab upon it.    The testimony of these witnesses is assailed by Dr. *George Millen* only, who swears, that before he struck *Lee* down, the latter flourished a knife about the person of witness, and that he knocked him down therefor; that he fell with the knife, (a common sailor knife with a wooden handle) and threw his hand behind him when falling, and witness thinks it " possible and probable," that *Lee* received the wound, when he was falling, from the knife which he had in his hand, and that although he saw prisoner grapple with *Lee*, he did not see him stab him, and does not think that he could have done so without his seeing it.    He admits, however, (what the other witnesses have testified to,) that after he knocked *Lee* down, he stepped back, and that some one from above commenced kicking or striking him, (*Millen*) and that he then went on deck, leav-

ing prisoner and *Lee* below—prisoner on his knees and *Lee* on his breech. When it is recollected that *Millen* was a participator in this violence to *Lee*, that he immediately after having struck *Lee* down, was kicked and cuffed from above, by which his attention must necessarily have been diverted from prisoner and *Lee*, and that he rushed on deck to make a better defence or fight, leaving prisoner and *Lee* below ; that his positive testimony that *Lee* had a knife in his hand is as equally positively denied by *Lee*, *Knight* and *Watts*, and that against the positive statement of the two latter, that they saw prisoner stab *Lee*, first in the back, and then in the right arm, he offers only the probability and possibility that *Lee* may have wounded himself in the fall, it is hard to conceive how the Jury could have come to a different conclusion than they did. Throwing aside entirely the testimony of *Lee*, they had the positive testimony of two witnesses, who were not proved to be interested, both to the fact that *Lee* had no knife in his hand, and consequently could not have fallen on it, and also, that prisoner was the individual who stabbed *Lee*. Now I am called to put aside this verdict and nullify the effect of this evidence, upon the faith of an affidavit, made by an individual, in a shop, where he had been drinking, which deposition is in opposition to his former testimony delivered in a Court of Justice, when he was perfectly sober, and when he was examined and re-examined on two occasions ; and in denial of his statement, made when he was very ill in the Hospital, and when there was no undue influence used towards him, and when the attending physician declares his belief, that the wound could not have been inflicted by a weapon of less than twenty inches in length. The case of the *Great Falls Manufacturing Company* vs. *Mathers*, 5 N. H. Rep. 574. (7 Amer. C. L. Rep. 114,) has been adduced by the prisoner's counsel, as a case analogous to the present. It appeared, in that case, that one *Moulton*, who testified for the defendant on the trial, had since been indicted for perjury in his testimony, had pleaded guilty to the charge, and had been sentenced to the State's Prison, and on

motion for new trial the Court say, "We think that the *conviction* of one of the defendant's witnesses of perjury in this cause, fur-- nishes a good reason why the verdict should not be permitted to stand.   An indictment for perjury, found by a Grand Jury, is no ground for a new trial, and perhaps a conviction is not, if founded upon the testimony of those who are interested in the cause.   But in this case, the witness has been convicted on his own confession." We have not the report of this case, and cannot therefore tell, whe- ther there had been on the trial, any corroborating testimony to the particular facts, detailed by the witness *Moulton*, but apart from that, I remark, that when a sane individual, upon an indictment charging him with perjury, with a full knowledge of the bodily suffering and imprisonment that will follow his confession, pleads guilty to the charge in a Court of justice, the idea that he has been tampered into such confession, would be wholly absurd.   But no such absurdity will attach to the idea, when such confession is made in a shop, where the individual has been drinking, and so far intoxicated as to be perceptible to the Magistrate who admin- istered the oath; and when it is made known, that in addition to this clouded state of mind, the oath thus administered, in a place so very unlike a Court of justice, was not even read to him, but he was sworn upon his saying that he knew the contents; and when we know how easily an illiterate man may have one affidavit read to him, and another presented for his oath, and that this paper so sworn to, was not intended to bring down punishment upon his head, as in the case of *Moulton*, but was made with the intention of immediately leaving the State, I think that the time, the place, the inducement, the consequences of the two cases are so different, as to justify me in the assertion, that one furnishes no authority for the other.   To make the distinction more manifest, the identity of *Moulton* was clearly ascertained by his pleading guilty in open Court, and thereby confessing that he was the same person who had testified in the suit, whereas here, the only proof that is offered

to shew, that the *John Lee* who swore to the affidavit, was the same *John Lee* who prosecuted prisoner, is the fact; that he is styled the prosecutor, in an affidavit, the signature of which is not shown to be the signature of *John Lee* who prosecuted, and when it is not stated that he is known to such Magistrate to be the same person who testified in the case; and indeed when the Magistrate declares, that he (the Magistrate,) did not know what was stated therein. Without laying further stress on this circumstance, I add, that with positive proof of identity, the failure in this affidavit, so carefully drawn up, to account for the stab or scratch in the right arm, which *Knight* and *Watts* swore was inflicted by prisoner, and which *Lee* recollected to have seen, would have cast sufficient doubt over the truth of this statement, taken in connexion with all other facts, to have made me discredit it. He surely did not get stabbed on the left part of the back, and the right arm, by the same blow.

It has been urged that this affidavit of the Magistrate will not be received to contradict his attestation, but when I find that such affidavit is not contradicted by the subscribing witness *Moxham*, and is confirmed in the allegation that *Lee* had been drinking, I do not feel myself authorised to put it aside.

But I am bound to see what effect the evidence would have on a new trial. These affidavits could not be used on such trial, unless *Lee* himself should again be made a witness. *Lee* is a seaman, a stranger—having no ties here; his affidavit discloses that at the time of his making it, he was about to leave Savannah for the West Indies; he has made himself liable to be indicted for perjury, either by *John Low*, whom he has accused of suborning him, or of prisoner against whom he has sworn. Under these circumstances, it is scarcely possible to suppose that he will voluntarily return. The evidence on such new trial, would, then, be confined to the testimony of *Knight* and *Watts* on the part of the State, and *Millen* on

the part of the prisoner—on the one side, there would be disinterested witnesses, and on the other (without intending to cast unnecessary reflection,) a witness, who from his connexion with the case, would be supposed to have a bias; there would be two witnesses against one—positive testimony (so far as proof of stabbing,) against negative. Would not the result be the same? But suppose *Lee* should be here. The Solicitor General after this proof of his worthlessness would not place him on the stand, and if a witness at all, he would testify on the part of the prisoner; but would not that testimony be destroyed by proof of what he had before sworn to, and must not the verdict *still be* based on the same testimony as if he were not here? Considered in any way, these affidavits would have no effect on another trial.

It is not necessary for me to decide whether a new trial on the merits can be granted in any case beyond a misdemeanor, but it certainly will not be granted when the presiding Judge is satisfied of the correctness of the verdict.

It remains for me to examine the ground assumed by prisoner's counsel, in reference to the refusal of the Court to allow him to challenge *for cause,* a juror whom he had challenged peremptorily on the former trial. If the prisoner has been denied any right, however guilty he may in truth be, he will nevertheless be entitled to a new trial. When the Jury were being empanelled on the second trial, a juror was presented to the prisoner and challenged *for cause,* and the cause assigned was, that he had been *peremptorily* challenged by prisoner on the former trial, (which ended in a mis-trial.) I determined that this was not a good challenge for cause. The prisoner then put the juror on his *voire dire,* and after receiving his statement on oath, that he had not formed and expressed any opinion in the case, and that he had neither bias nor prejudice for or against him, he again peremptorily challenged him. The principle now assumed by the prisoner's counsel is, that a peremptory challenge is always considered by jurors as an

attack upon their integrity; as a suspicion on the part of the prisoner that the juror will not do him justice, and that this creates a prejudice in the mind of the juror against the prisoner, which renders him unfit to sit on the trial; and this " *legal* presumption" of prejudice is supposed not to be falsified or removed, by the subsequent oath on the part of the juror, that no such prejudice does in fact exist. Before I make such a decision, I must look to the principle upon which it is based, and the consequences that will follow it. This prejudice on the part of the juror, I repeat, is supposed to be aroused by the impeachment of his integrity by the prisoner. It is not, therefore, a prejudice growing out of a knowledge of the circumstances of the case, nor because of any relationship or feeling which he may have for those who are prosecuting—but it is a prejudice against the person of the prisoner, springing from his attack on the jurors' integrity, and which embitters his feelings, so far as to prevent him from doing the prisoner justice. Such a prejudice cannot with any kind of consistency or reason, be confined to the particular indictment then about to be tried against the prisoner. It would reach other indictments, to be tried by the same panel, at the same term. Suppose that four indictments should be found against a prisoner, at one term. (This has happened in this Court, and it is not impossible, therefore, that it may again happen.) Upon each he is entitled to twenty peremptory challenges, and on the trial of three, he has used that privilege. When put upon his trial, on the fourth indictment, he can still challenge twenty peremptorily, and he can also set aside the sixty Jurors, whom he has challenged peremptorily, on the three indictments on which he has been tried, although they should swear to him, that they were wholly impartial, and though he should be unable to falsify their oaths, or to shew that there was the least suspicion against them, save what he has chosen to cast, by his peremptory challenge. Thus, on this fourth indictment, if the principle contended for be correct, instead of having *twenty*, he would have *eighty*, " arbitrary, capricious" challenges. He would

be saying to *sixty* men, I do not think you honest, and though I cannot, on this trial, challenge you peremptorily, or shew that in fact you are not impartial, yet, the law will presume that my attack upon your integrity, has made you prejudiced against me, and I will therefore, challenge you *for cause*. But when would this supposed prejudice end? We know its beginning, but who can read the human heart so well, as to lay down a time when, as a general rule, it shall cease. Shall we refuse, at one term, to believe the juror on his oath, when he solemnly swears, that such challenge has created no prejudice on his mind against the prisoner, and then, at the next term, whether six or only two months shall have elapsed, permit him to purge away the legal presumption, by the same oath that we denied our belief to, and the echo of which is still upon our ears? Could the prisoner, if he had not been tried again this term, have objected to this juror, for the same ground, at the next, or any succeeding term? If so—if this general prejudice against the person of the prisoner, cannot be limited with consistency or reason, (looking to the principle upon which it is founded,) either to the same case, or the same term, it is not hard to perceive, that in most counties it would hinder—in some, it would wholly prevent, the operations of justice. I am perfectly aware, that the prisoner's counsel have not sought to carry the principle beyond the particular case, or the same term, but I am equally certain, that if admitted at all, it cannot be so confined. The principle cited from *Chitty's* Criminal Law, that " the same person who has been challenged on the original panel, cannot afterwards be sworn on the *tales*, and if that should be done, a new trial will be granted," cannot be made to apply to this case. If an individual, whom the prisoner had a right to challenge, and whom he had so challenged, and who was therefore set aside, should have been, notwithstanding, put on the Jury, *at the same trial*, it would have, indeed, been denying to him, one of his " arbitrary capricious" challenges. It would be putting a man on the Jury, whom the prisoner, in the exercise of his legal right, had

*peremptorily* put aside ; but the features of the case are considerably changed, when on a *second* trial, he seeks to set the juror aside, not in the exercise of the peremptory right which the law allows to him, but because wishing to use his twelve "capricious" challenges against others, he strives to thrust away the juror, on an alleged *legal* presumption, rebutted by the individual.

It was to meet these general prejudices, growing out of antecedent circumstances, or from undefined dislike on the part of the prisoner, that the law, in its mercy, has given to him a certain number of arbitrary and capricious challenges. He did upon this trial, put aside twelve men, who called on God to witness their declarations, that they were impartial, against which solemn assertion no proof was offered, and he has therefore had his twelve arbitrary and capricious challenges. I am assured, that on this point, no injustice has been done to him—no right withheld from him.

*It is ordered*, that this opinion be entered on the minutes, and that all the affidavits appertaining to this motion, be filed as of record, in the office of the Clerk of this Court.

The motion is denied.

BERRIEN & LAW, L. S. D'LYON, and M. H. M'ALLISTER, for Prisoner—JOHN E. WARD, Solicitor General, and JOHN MILLEN, contra.